We're happy to hear argument in our third case, number 14-2120, Purdue Foods v. BRF. Mr. Wright? May it please the Court. Damon Wright on behalf of the appellant at Purdue Foods. In Burger King v. Rutzquitz, the Supreme Court held that a contract that creates continuing obligations between a non-resident defendant and a form resident. Sorry about that. Closing the door on your argument. The Supreme Court held that a contract by which a non-resident defendant assumes continuing obligations with a form resident is sufficient to support the first prong of a specific jurisdiction, especially where the contract has a choice of law provision that says the form state's law governs. The lower court didn't apply the Burger King continuing obligations test. The lower court applied the purposefully directed activities test of Burger King. Burger King lays out a disjunctive kind of analysis, and sometimes the court merges them, but it actually says where the defendant deliberately has engaged in purposeful activities in the state or has created continuing obligations between himself and residents of the form, he manifestly has availed himself of the privilege of conducting business. So the obligation is not to do something, right? In this case, that's correct. So you could sue him anywhere in the world? No, no. In this case, the obligation was to not do something. We have Purdue, a Maryland company, BRF, a Brazilian company, and the obligation was to not use the PREDICTS wordmark all around the world, including the United States, including Maryland, and Purdue, on the other hand, agreed not to use the Purdue wordmark in Brazil. There was an exchange of consideration. It wasn't cash being paid back and forth, but if we were neighbors and I had an easement to drive through your front yard and you had an easement to drive through my backyard, but both of us didn't like having each other driving through our yards, we could reach an agreement, and it's an agreement not to do something, but it's still an exchange of consideration. And what we have here is really kind of like a global peace treaty of sorts because you've got two multibillion-dollar companies that are each agreeing from that point forward through the end of time to restrict their advertising. Could you sue them in North Dakota if they went up there with a PREDICTS piece of chicken? Your Honor, I don't know if North Dakota would have the connection to the case. Well, how did this Brazilian company avail itself of Maryland law? Under what circumstances did they ever avail themselves? Your Honor, it goes back to Burger King. I understand, and that's in Burger King, too, about purposeful. Yes, it is. Yes, it is. BRF availed itself of Maryland in many of the same ways that this poor small business owner in Michigan availed himself of Florida. Retzkowitz never visited Florida. He had a business partner that did some training in Florida. What you had in the Burger King versus Retzkowitz, you had Burger King headquarters in Miami, Florida, and a small business owner in Michigan, and he thought, let me open up a Burger King operation. He never visited the state. The only reason he contracted with a company in Florida is that that's where Burger King's headquarters happened to be. He actually was initially dealing with the Michigan district office of Burger King. He never sold any Whoppers in Florida. He never advertised in Florida, never used Burger King's trademarks in Florida. The agreement that he reached with the Burger King headquarters, his business, his Burger King franchise, opened in June of 1979. Almost immediately, he couldn't pay his bills. And so by May of 1981, he was facing suit in federal court. So to answer your question, if he purposely availed himself of Florida, when the only reason he went to Florida, and he never ever physically entered there, the only reason he was contracting with Florida is because that's where Burger King happened to be, by the same token here, BRF availed itself of Maryland. And let me make a point. We have two agreements here. We have the 2003 worldwide coexistence agreement. And again, this is a major peace treaty. The court didn't credit the agreement in its personal jurisdiction analysis. It talked about it, but it basically said it's irrelevant. The only thing important about the agreement is the choice of law provision, but it's a very important agreement. And that's something that the court says must be considered under Burger King, under consulting engineers, the nature of quality. But then you have another agreement, the 2005 addendum. And with that, BRF actually said, there's a little bit of this 2003 agreement that isn't working out for us in Saudi Arabia. So they actually went back to Purdue and said, okay, we'd like to amend. And so there's another agreement. But Burger King envisions continuing and wide-reaching contacts. Since 2005, what communications were there between Burger King, between your company, Purdue, and BRF? Sure. And you're absolutely right about Burger King. There was a short duration of a relationship there. But what we have in our case, the 2003 agreement, the 2005 addendum, and then, as we've explained, because of the peace treaty, there was spirit of cooperation. Purdue and BRF did business together. And so BRF sold over 700,000 pounds of chicken, making over $600,000 by dealing with Purdue's people in Maryland. Now, that chicken never actually entered Maryland. But that's business that BRF conducted in Maryland. Is that your only contact? I'm not sure what your argument is with respect to that order. Because if that is the only contact, then it seems to me that undermines your whole argument. So you tell me what's the significance of that. The significance of it is what Burger King says, look to the actual course of dealing and the future consequences. If the two companies had been battling each other in court, they wouldn't have done over $600,000 of business together. Well, it seems to me that maybe there were letters back and forth and maybe there were telephone calls and maybe somebody came to Maryland. But we don't have any of that in this record. Understood. Totally understood. It's not required under Burger King. It's not required under consulting engineers. But here's the practical situation. It happened over 10 years ago. Purdue doesn't have the e-mails. There's no one there who remembers we had this phone call on this date and here's who was on the other side. But these are two agreements that didn't just emerge from immaculate conception. But if I could take you through the consulting engineers factors. Well, before you do that, you were talking about the chicken, right, the chicken order. Is there anything in this record that says that that is based on, is that the fruit of this agreement? There's nothing that says that's the fruit of the agreement. The agreement was not to sell chicken. What did it have to do with the chicken order? Well, the agreement was, as I said, a peace treaty. Right. And it encouraged the cooperation. It was a contract not to do business, which you're not happy with, but that's what it was. Right. It was a contract to not infringe or use similar marks and it was an important contract. And that's what we're stressing here. The case law. I'm sorry to interrupt you, but I won't do it again. No, please. But then you said that you started talking about this 2012-2014 chicken orders. So what do they have to do with this contract not to interfere with each other? Understood. They don't have anything to do with the contract terms, but in terms of what was the relationship created by the contract, the relationship created by the contract was a relationship of, rather than being global competitors, there are going to be times when we can work together because we've reached that peace treaty in the past. So it does arise out of the same relationship, and that's something that Burger King says should be considered. Well, it arises out of the fact that they're both in the chicken business. That's what it really arises out of. It doesn't have anything to do with the non-compete or the non-advertising part of it. Why don't I move on? The concept is that there was a relationship here, and it is a relationship that wasn't credited by the court. It's the contract, plural, contracts. The court needed to have examined the nature, the quality, the importance of the contracts, and it's as if Chevrolet and Chevron reached an agreement and they said, okay, we're each going to not use the word Chevrolet or the word Chevron by itself. And all of our advertising around the world, we'd all agree, that's a pretty substantial contract. And if it had a Michigan choice of law provision, we'd say, okay, Chevron could expect to be sued in Michigan if it breaches. Well, no, it could expect to be sued anywhere Chevron does business because that would be probably a general jurisdiction suit. And I guess my point is if Chevron said we don't have any gas stations in Michigan, under Burger King and this court's case law, the analysis would be that doesn't make a difference because you assumed continuing obligations to a resident of the form state. It doesn't matter if the obligations are not to do something or to do something. They're the same in terms of the importance of the continuing obligations. So why couldn't they sue BRF in North Dakota then or BSF, whatever they are? Because they agreed not to put their logo up there. Right, if BRF sold chicken in North Dakota. Well, they didn't sell any chicken in Maryland, did they? They did not sell chicken in Maryland, but Maryland has a connection to the case because that's where the contracts, the communications between the parties are embodied in agreements between a Maryland resident and a Brazilian resident. And that's why Maryland has a connection. And the choice of law provision is actually entitled to a significant weight. If I could just go through the… The choice of law provision doesn't determine whether we have personal jurisdiction. It's not dispositive. No. Right. That's correct. But it certainly shows that the parties had a sense of what court would be best suited to handle this matter. They understood it was a contract arising under Maryland law. Let me just quickly address the court's error was not crediting the terms and the continuing obligations in the agreement. Under Burger King, that is required. Everything you're saying about the lack of a physical presence in Maryland, the lack of shipping chicken in Maryland, the same thing applies to Burger King. Red Squids didn't have a physical presence in Florida. Didn't send burgers to Florida or sell burgers in Florida. But there was a contract with a resident in Florida that imposed continuing obligations. The consulting engineer's factors, Your Honor, they focus somewhat more on the purposefully directed activities test and less on the continuing obligations test. They're non-exclusive. There are eight factors. They're not supposed to be used as a scorecard either, but those eight factors actually support personal jurisdiction here. So we first have factor number seven. That's the nature, the extent, the quality of the parties' communications about the business being transacted. We have the 2003 agreement, the 2005 addendum. Again, multibillion-dollar companies agreeing to restrict their respective advertising through the end of time. The nature, the quality of those communications embodied in those agreements could not be more manifest. This is not a one-off, trivial commercial contract. This was a major undertaking by both companies. That's what the lower court failed to acknowledge, failed to credit. Factor five, whether the parties contractually agreed that the law of the forum would govern. Obviously that factor supports personal jurisdiction here. Factor four, whether the defendant deliberately engaged in significant or long-term business activities in the forum state. As we've said, we have the original agreement and then we have BRF coming back in 2005 and saying, we want to enter into a new agreement, an addendum to the earlier agreement. BRF initiated that contact, and we've talked about the over $600,000 in sales in chicken, but that is transacting business that does arise out of a relationship. We've got invoices and emails from Brazil BRF people to Purdue. They're in the chicken business. There are times when they're going to want to work together, but because of that relationship they'd fostered, rather than having to deal with Purdue versus Predix litigation in markets all over the world, they were able to work together. So factor four supports personal jurisdiction. Factor eight, where was the performance of the contractual duties to be performed? In Maryland and in Brazil.  And every day since the agreements were executed, BRF has essentially reached into Maryland and controlled Purdue's marketing decisions. Purdue's been performing the entire time. It's seeking specific performance here. A non-resident defendant might be in Brazil, but they are getting the benefit of Purdue's performance, and Purdue expected, of course, that there'd be performance in return. The case most controlling, or I'm sorry, the case most analogous to ours is American Eagle. And I'll discuss that case perhaps in a rebuttal, but it's very similar. The court found personal jurisdiction. The difference, there was some in-person contact. I'm sorry, in physical contact. Isn't Diamond Healthcare arguably dispositive? Maybe it was wrong. There's a dissent, but there it is. I'll answer that question in the rebuttal if I may. Sure. Good morning. I please the court. Jeffrey Ostrow for BRF. Cut right to the chase here. There is no such thing as a continuing obligations test that Purdue has laid out in its brief, particularly its reply, where it cites it 18 times, and its argument this morning. Continuing obligations are a factor included in factor four of consulting engineers, which is the eight-part test, as this court well knows. It's this court's test for deciding whether or not this personal jurisdiction in the case of a specific jurisdiction obligation. It is one thing you look at, and, in fact, if you go look at the consulting engineering opinion, it cites Burger King under factor four. There is no separate disambiguated continuing obligations test where a court were to look to see whether or not this is the only thing that supports jurisdiction. One would think if such a test existed, there'd be a case that cited such a test as a standalone independent test somewhere in the jurisprudence. There isn't one. The only place in the Westlaw database I could find where the phrase continuing obligations test is found is in their reply brief. And if this court were to create, I would put it to the court, create a continuing obligations test, it would be, frankly, a remarkable outcome here. The way we look at personal jurisdiction in a case like this is through this court's well-established eight factors, non-exclusive but eight factors in consulting engineers. You would agree that there are continuing obligations under this contract? As Judge Gibney said over and over again, it's a continuing obligation to do nothing. Yes, I would agree with that. We have an obligation not to do something. Yeah, but there are lots of contracts that are entered into where the parties agree not to do something. That's not so extraordinary. Judge Moss, let me give you an example that I was thinking of here. Had Mr. Wright had a boat in Virginia Beach and I came to visit him down here and he sold it to me. He's a Maryland resident. I'm a California resident. And he sold it to me. You're being here. You thought it would be nice to have a vacation here? Oh, you're not really a California resident. No, I'm really a California resident. I live here. You made a bad choice to come here. Cold weather. Well, he sold me his boat in Virginia Beach, and we executed the transaction in Virginia Beach, and we agreed that Maryland law would govern the agreement. And the one provision in the contract that we had says you're not going to tell anybody about this. I had a continuing obligation of confidentiality. I went back to California and I told everyone I knew that I bought this boat from Mr. Wright. He then sued me in Maryland. I have a continuing obligation, and I have no connection to Maryland. The fact that he lives in Maryland and my continuing obligation goes to him. No, I think that's a good example. I worry about, because this does involve pretty sophisticated big corporations, and so really what you're saying is that your client entered into a contract that was never going to be able to be enforced against us. Your contract, your corporation is smaller than, I don't know. Our corporation is quite large. It's one of the largest food companies in the world. Larger than? I don't know. I believe they're both private companies, so I'm not sure how I'm going to evaluate that. But suffice it to say, they both have billions of dollars in sales. Let's take it away from your client. Okay. I wouldn't want to say this, but some Sharpie client, not your client, another corporation. Mr. Ratliff's company. Okay. Enters into this contract, which is going to get an advantage. It's going to keep its competitor from doing business where it wants to expand  Yes, ma'am. And then it decides it's not going to abide by the contract ever. Doesn't there seem to be something wrong with that? Let me offer you a very good solution, one that is not in the record, but they've taken here, which is to sue us in Brazil, which they did after the record was closed in this case. Now, I admit I don't have the complaint to give you. I'm sure Mr. Wright will acknowledge that it, in fact, has happened. Yeah, but that's a lot more trouble. Mr. Wright has to go down to Brazil. Your Honor, I agree that one of the things you need to consider, as the district court did here, was is it going to be trouble? It's part, though, of the third prong of the ALS scan analysis, the three-part analysis for due process, which is whether it's fair. Is it fairer to sue us in Maryland, or does it violate a front due process? Or are we better off, as the district court said, taking us to different jurisdictions? Help me with this. Is the allegation in the complaint that your client has violated this agreement, has it violated this agreement by selling goods in Maryland? No, ma'am. There is no allegation that we have sold goods to Maryland. We have not sold goods to Maryland. Or in the United States of America? Not at all. The allegation is that we have breached the agreement by filing for trademarks in places like Saudi Arabia, Canada, China, a couple of other jurisdictions. None of them the United States. And certainly, even if we were to do so, none in Maryland. How is that activity directed towards Maryland as the forum state? It's not. That activity is not directed towards Maryland, Judge Floyd. I mean, the only connection to Maryland here is that plaintiffs in Maryland. We did nothing. Well, there's the choice of law. You're right. Factor V, which I think is Factor V of consulting engineers, is choice of law, and I will give them that one. I think the other seven go our way. And, frankly, unless the court has lots of other questions on this, I mean, I think our argument is reasonably straightforward. I don't want to bore you by going through our eight-factor analysis, which is laid out factor by factor in our brief. I came here today essentially to tell the court that this idea that there is a separate and continuing obligations test under Burger King is not right. If you look at the Burger King decision, I think it's page 453, the discussion of continuing obligation is under the purposeful availment provision. That's where it's talking about it. So there is no separate test. It does not exist in American jurisprudence. All right. Thank you. I think we understand your argument. Thank you. Thank you. The question that was asked moments ago was, there are no sales of chicken in Maryland, so how does the breach affect Maryland? And, again, this is the same fact pattern in Burger King. Burger King was suing Bretzkowitz for breach of contract, saying you owe us money on your lease in Michigan, and you shouldn't be using the Burger King logo in Michigan. There was no misconduct happening in Maryland. You had an agreement that said don't do something, don't use our logo without paying for us, paying us for it, but that was in Michigan. And here we have an agreement that says don't do something, and it doesn't have to have happened in Maryland. They don't have to have sold chicken in Maryland to have caused harm and to be subject to personal jurisdiction in Maryland. Now I understand Mr. Oster says there is no such thing as a continuing obligations test. There is. There are lots of district court opinions, Maryland franchise opinions, franchisee opinions dealing with the continuing obligations test. There's a Western District of Virginia opinion we've highlighted in our brief that underlines the word or, emphasizing it's disjunctive. The defendant can be subject to specific jurisdiction by deliberately engaging in purposeful activities in the state, in person presence, or by creating continuing obligations between itself and the residence. So when you have that, and you have that coupled with choice of law provision, Burger King says you've got the first prong of specific jurisdiction. And this court and the Supreme Court have repeated that same principle in other cases. So in the English and Smith v. Metzger Fourth Circuit opinion, the Fourth Circuit has explained that even a single act by a non-resident which amounts to transacting business and gives rise to a cause of action may be sufficient to confer jurisdiction. Your Honor, I apologize. That case was not addressed in the briefs by either side. Okay. I was actually. Maybe just as well, as I say. Maybe it's wrong. Pretty thin. I looked at it on my phone just quickly. It's all right. Don't worry about it. It looks like the court focused on the purposefully directed activities. Part of this from a quick review and not the continuing obligations test. There are a lot of one-off contracts out there. You buy a TV and you pay $300 and that's the end of the deal. Or you ship some wheat and you pay $1,000 and that's the end of the deal. But this is unique because it's an agreement that continues forever and it binds both parties forever. That's why the continuing obligations part is so important. I know I've said it several times, but the lower court just did not appreciate the importance, the quality, the nature of this agreement that was so important to two multi-billion dollar global competitors. And I'll point out as compared to Burger King versus Swetskowitz, BRF is not a small business center in Michigan. They are much bigger than Purdue. And they have a substantial presence in other respects in the United States between being sold in the New York Stock Exchange, filing trademark applications with the Patent and Trademark Office. The reason this case. That's in Virginia. That is in Virginia. Yes, it is. We sued them here. That's correct. We sued them in Maryland. The reason this case was filed was because they filed a trademark application to use the PREDICTS boardmark on chicken in the U.S. And we said, oh, you can't do that. And we spent some time, lawyers, not companies, but lawyers trying to get them to stop doing that, and then they withdrew that just before we filed our complaint. But meanwhile, we discovered that all across the world, many, many countries, they've been applying to use the PREDICTS boardmark on their chicken. On the point that Mr. Osprey made that there's no such thing as a continuing obligations test, again, the Travelers Association versus Virginia Supreme Court opinion quoted in Burger King, quoted by this court, explains parties who reach out beyond one state and create continuing obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities. That's the continuing obligations test. Is that your best case? That Burger King, American Eagle, they cited, they don't have their best case. They've cited a case about settlement agreements. This is just like a settlement agreement. Well, the case they cite for that, it wasn't even a settlement agreement. A Swedish company, a North Carolina company, were in litigation in Sweden about patent infringement allegedly happening in Sweden. Then they had settlement discussions. There was an agreement in principle. The Swedish company said, no, we're not going to do it. And the North Carolina company sued them in federal court in North Carolina to enforce the settlement agreement about litigation in Sweden concerning conduct in Sweden about a settlement agreement that had never been signed, but it was simply settlement discussions. They don't have a case. So they have the lower court's opinion. But, again, you cannot ignore the agreement. It needs to be credited. It's very important to the contact here. It is what supports personal jurisdiction. Thank you very much. We will come down and greet the lawyers and then go directly to our last case.
judges: Diana Gribbon Motz, Henry F. Floyd, John A. Gibney, Jr.